UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

MARGARITA LÓPEZ TORRES, STEVEN
BANKS, C. ALFRED SANTILLO, JOHN J.
MACRON, LILI ANN MOTTA, JOHN W.
CARROLL, PHILIP C. SEGAL, SUSAN LOEB,
DAVID J. LANSNER, and COMMON
CAUSE/NY,

                    Plaintiffs,

v.

NEW YORK STATE BOARD OF ELECTIONS;
CAROL BERMAN, NEIL W. KELLEHER,
HELENA MOSES DONOHUE, and EVELYN J.
AQUILA, in their official capacities as
Commissioners of the New York State Board of
Elections,

                    Defendants.

-------------------------------------------------------------X

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

_CV 04   1129_

_FILED_

_IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y._

_★ MAR 18 2004 ★_

_BROOKLYN OFFICE_

_GLEESON, J._

_GOLD, M.J_

Plaintiffs, by their attorneys, the Brennan Center for Justice at New York

University School of Law, as and for their complaint against Defendants, allege as

follows:

## INTRODUCTION

1.      Plaintiffs – several judicial candidates and voters from across New

York State – challenge the method by which justices of New York State's Supreme Court

are selected.  In violation of the First and Fourteenth Amendments to the U.S.

Constitution, New York's uniquely byzantine, closed judicial convention system denies

voters their right to choose among their parties' candidates for Supreme Court by placing

severe and unjustified burdens on candidates seeking to challenge candidates who are

backed by local Democratic or Republican Party leaders.

2. The selection process is supposed to proceed in three steps as follows:

- Judicial delegates and alternates are "elected" in September each year to serve at a judicial convention.

- At the convention, the delegates consider and "nominate" their party's Supreme Court candidates for the general election.

- At the general election, voters "choose" among the candidates.

3. In reality, each step of the selection process is structured to eliminate meaningful participation by voters, party members, and candidates other than those selected by party leaders:

- Delegates are hand picked by county party leaders and rarely appear on the ballot at all. In New York City, for example, from 1999 through 2002 only 14% of the judicial delegate candidates selected by the parties actually appeared on any ballot in New York City. Delegates are even less likely to appear on the ballot outside of New York City.

- Because of the insurmountable burdens of running delegates for the convention across a judicial district, real challenges almost never occur, and never succeed. From 1994 through 2002, for example, *none* of the Supreme Court candidates who were selected at Democratic or Republican conventions across the State about whom data are available (*i.e.*, 562 of 568) were successful challengers without the party leaders' support. Unlike *every other elective office in New York State*, moreover, there is no way for a challenger to petition onto the ballot for Supreme Court as a major party candidate.

- At the general election, the county party leaders often cross-endorse candidates or simply run none at all, so that more than 62% of New York State voters live in judicial districts where the two major parties contest less than half the Supreme Court elections and voters face literally no choice at the polls. In all, more than three quarters (76%) of the Supreme Court elections from 1990 through 2002 across the state were either uncontested or wholly non-competitive (*i.e.*, the losing candidate garnered less than 80% of the winning candidate's vote total).

4. By every measure, this sham "election" process impermissibly burdens the constitutional rights of candidates, party members, and voters. Specifically, it imposes uniquely insurmountable burdens on the ability of candidates to gain access to

2

the ballot, deprives rank-and-file party members of their rights to associate to choose their party's candidates, and takes from all New York State voters their right to vote effectively.

5.    Moreover, the current system denies voters and candidates across the state equal protection of the laws by imposing, without legitimate justification or rationale, a virtually insurmountable burden upon any challenger candidates for Supreme Court, while imposing a lesser burden on candidacies for civil court judgeships and all other elective state offices.

6.    Far from serving any legitimate, much less compelling, state interest, this undemocratic system directly contravenes the only relevant state interest, namely the New York State Constitution's command that Supreme Court justices "shall be chosen by the electors [i.e., the voters] of the judicial district in which they are to serve." N.Y. Const. art. VI, § 6.

7.    On December 22, 1952, a *New York Times* editorial quoted a New York State judge who complained that

> the State Constitution contained an "absolutely false" pretense. "It pretends," he said, "that the people select the [Supreme Court] judges. That is the greatest farce that has ever been enacted in the history of democracy. . . . The selection of judges is made not by the people but by the leaders of the predominant parties."

Plaintiffs seek to correct this "farce" and return the judicial selection process to the voters as required by the First and Fourteenth Amendments to the United States Constitution.

## JURISDICTION AND VENUE

8.    The Court has jurisdiction of the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), (4), 1367(a), 2201, and 2202, and 42 U.S.C.

3

§ 1983.

9.    Venue of this action is properly in this district, pursuant to 28 U.S.C. § 1391(b), on the grounds that a substantial part of the events or omissions giving rise to the claims alleged herein occurred, and will continue to occur, in this district.

## PARTIES

10.    Plaintiff Margarita López Torres has served as a judge of the Civil Court of the City of New York in Brooklyn longer than all but two other judges. Judge López Torres, a native of Puerto Rico who has lived most of her life in Brooklyn, was elected to the bench in November 1992, the first Latina ever elected to the Civil Court in New York City, and reelected in 2002. Prior to joining the bench, Judge López Torres served as the Deputy General Counsel of Children and Family Services for the New York City Human Resources Administration, as the Director of Family Law at Brooklyn Legal Services Corp., as an Assistant Corporation Counsel for the City, and as a staff attorney and managing attorney at MFY Legal Services. Judge López Torres has repeatedly sought to obtain the Democratic nomination for Supreme Court in the Second Judicial District (in Brooklyn and Staten Island), in 1997, 1998, 2002, 2003, and currently, in 2004. Despite her widespread support among voters and her exemplary service as a judge and legal services attorney, for reasons entirely unrelated to her judicial qualifications and experience she has not obtained the support of the Democratic Party county leadership in Brooklyn. As a result of New York State's uniquely burdensome and restrictive judicial convention system for selecting Supreme Court justices, without the county party leaders' backing Judge López Torres has not had any meaningful opportunity to obtain her Party's convention nomination and a place on the general

4

election ballot as a Democrat. As a past and present candidate for Supreme Court, Judge López Torres has been and will continue to be prevented by New York's statutory rules from mounting a viable convention challenge to the leadership-backed candidates, and from having any opportunity to gain a place on the ballot for Supreme Court as a Democratic candidate. As a plaintiff, she seeks through this lawsuit to reduce the barriers faced by candidates who seek a place on the ballot as a Democratic Party candidate.

11. Plaintiff Steven Banks has been a resident of New York City for 25 years and has lived in Brooklyn since 1997. He is a registered voter enrolled in the Democratic Party and has voted regularly in New York State judicial and other elections for the past two decades. In 2001, Mr. Banks ran as a Democratic candidate for City Council from the 39th District in Brooklyn. As a result of New York State's uniquely burdensome and restrictive judicial convention system for selecting Supreme Court justices, Mr. Banks has been deterred from running for Supreme Court to date. In the future, Mr. Banks will be prevented from having any opportunity to gain a place on the ballot for Supreme Court as a Democratic candidate. If Plaintiffs are successful in reducing the barriers faced by candidates to obtain such opportunity, he intends to run for Supreme Court. As a voter, Mr. Banks has been and will continue to be deprived of his constitutional right to choose his party's candidates for Supreme Court in his district, including Judge López Torres whom he would support for that position.

12. Plaintiff C. Alfred Santillo has been a resident of Schoharie County in Upstate New York since 1982. He is a member of Common Cause/NY. He is a registered voter enrolled in the Republican Party and has voted regularly in New York State judicial and other elections for over two decades. As a voter, because of New York

5

State's uniquely burdensome and restrictive judicial convention system for selecting Supreme Court justices, Mr. Santillo has been and will continue to be deprived of his constitutional right to choose his party's candidates for Supreme Court in his district.

13.    Plaintiff John J. Macron is a resident of Belle Harbor in Queens. He is a registered voter enrolled in the Republican Party, and has voted regularly in judicial and other elections for over 20 years. He has run as a Republican candidate for the New York City Council from Queens, and served as a delegate to the Republican National Convention from New York in 2000. As a potential candidate for Supreme Court, Mr. Macron has been and will continue to be prevented from having any opportunity to gain an a place on the ballot for Supreme Court as a Republican candidate by the current judicial convention system. If Plaintiffs are successful in reducing the barriers faced by candidates who seek a place on the ballot as a Republican Party candidate for Supreme Court, Mr. Macron intends to run for this position. As a voter, because of New York State's uniquely burdensome and restrictive judicial convention system for selecting Supreme Court justices, Mr. Macron has been and will continue to be deprived of his constitutional right to choose his party's candidates for Supreme Court in his district.

14.    Plaintiff Lili Ann Motta has been a resident of East Marion in Suffolk County, Long Island since 1980. She is a member of Common Cause/NY. She is a registered voter enrolled in the Democratic Party and has voted regularly in New York State judicial and other elections for over 30 years. As a voter, because of New York State's uniquely burdensome and restrictive judicial convention system for selecting Supreme Court justices, Ms. Motta has been and will continue to be deprived of

6

her constitutional right to choose her party's candidates for Supreme Court in her district.

15.    Plaintiff John W. Carroll has been a resident of Brooklyn all of his life (51 years) and now resides in Kensington, Brooklyn. He is a registered voter enrolled in the Democratic Party and has voted regularly in New York State judicial and other elections for over 30 years. He has served as president of the Central Brooklyn Independent Democrats, and most recently, ran for City Council from the 39th District in 2002. As a voter, because of New York State's uniquely burdensome and restrictive judicial convention system for selecting Supreme Court justices, Mr. Carroll has been and will continue to be deprived of his constitutional right to choose his party's candidates for Supreme Court in his district, including Judge López Torres whom he would support for that position.

16.    Plaintiff Philip C. Segal has been a resident of Brooklyn since 1977. From 1991 to 2001, Mr. Segal served as a Judge in New York State Family Court. He is a registered voter enrolled in the Democratic Party and has voted regularly in New York State judicial and other elections for over 25 years. In 1994, he sought to become a Democratic Party nominee for Supreme Court in the Second Judicial District. As a result of New York State's uniquely burdensome and restrictive judicial convention system for selecting Supreme Court justices, without the county party leaders' backing Mr. Segal did not have any meaningful opportunity to obtain his Party's convention nomination or a place on the ballot as a Democratic candidate. As a candidate for Supreme Court, Mr. Segal has been and will continue to be prevented by New York's statutory rules from mounting a viable convention challenge to the leadership-backed candidates, and from having any opportunity to gain a place on the ballot for Supreme Court as a Democratic

7

candidate. As a voter, Mr. Segal has been and will continue to be deprived of his constitutional right to choose his party's candidates for Supreme Court in his district, including Judge López Torres whom he would support for that position.

17.    Plaintiff Susan Loeb has lived in Brooklyn for 33 years. She is a registered voter enrolled in the Democratic Party, and has voted regularly in New York State judicial and other elections for over 25 years. She is a former president of the Central Brooklyn Independent Democrats, and ran for City Council in 1997 from the 38th district. As a voter, because of New York State's uniquely burdensome and restrictive judicial convention system for selecting Supreme Court justices, Ms. Loeb has been and will continue to be deprived of her constitutional right to choose her party's candidates for Supreme Court in her district, including Judge López Torres whom she would support for that position.

18.    Plaintiff David J. Lansner has lived in Brooklyn since 1976. He is a registered voter enrolled in the Democratic Party, and has voted regularly in New York State judicial and other elections for over 25 years. He is a former president of the Central Brooklyn Independent Democrats, and also was a member of the Democratic Party County Committee. As a voter, because of New York State's uniquely burdensome and restrictive judicial convention system for selecting Supreme Court justices, Mr. Lansner has been and will continue to be deprived of his constitutional right to choose his party's candidates for Supreme Court in his district, including Judge López Torres whom he would support for that position.

19.    Plaintiff Common Cause/NY is a non-partisan, non-profit membership organization with approximately 20,000 voting-age members across New

8

York State. For three decades, Common Cause/NY has represented and advocated for voters in New York to make government more responsive and open to citizens, to restore ethics in government, and to curb the influence of special interest money in politics. As New York State voters, because of New York State's uniquely burdensome and restrictive judicial convention system for selecting Supreme Court justices Common Cause/NY's members have been and will continue to be deprived of their constitutional rights to choose their parties' candidates for Supreme Court. As the representative of such voters, Common Cause/NY seeks to reform the current Supreme Court selection system in the first instance to allow greater access to the ballot for major party candidates and a greater choice for voters.

20.    Defendant New York State Board of Elections has "jurisdiction of, and [is] responsible for, the execution and enforcement of . . . statutes governing campaigns, elections and related procedures." N.Y. Elec. L. § 3-104(1).

21.    Defendants Carol Berman, Neil W. Kelleher, Helena Moses Donohue, and Evelyn J. Aquila are Commissioners of the New York State Board of Elections.

22.    As a courtesy, Plaintiffs have also provided notice of this lawsuit and a copy of the complaint to the New York State Democratic Committee and the New York Republican State Committee, which are not parties to this lawsuit. Plaintiffs have also provided a copy of the complaint to the New York State Attorney General.

### THE CHALLENGED PROVISIONS OF LAW

23.    The judicial convention process in New York State is established and defined, in principal parts, by the New York State Election Law.

9

24.    Section 6-106 of the Election Law provides that "[p]arty nominations for the office of justice of the supreme court shall be made by the judicial district convention." N.Y. Elec. L. § 6-106.

25.    Section 6-124 of the Election Law provides for the number of delegates and alternate delegates at the judicial conventions, stating in relevant part:

> A judicial district convention shall be constituted by the election at the preceding primary of delegates and alternate delegates, if any, from each assembly district or, if an assembly district shall contain all or part of two or more counties and if the rules of the party shall so provide, separately from the part of such assembly district contained within each such county. The number of delegates and alternates, if any, shall be determined by party rules, but the number of delegates shall be substantially in accordance with the ratio, which the number of votes cast for the party candidate for the office of governor, on the line or column of the party at the last preceding election for such office, in any unit of representation, bears to the total vote cast at such election for such candidate on such line or column in the entire state. The number of alternates from any district shall not exceed the number of delegates therefrom. . . .When a duly elected delegate does not attend the convention, his place shall be taken by one of the alternates, if any, . . . and if no alternates shall have been elected or if no alternates appear at such convention, then the delegates present from the same district shall elect a person to fill the vacancy.

N.Y. Elec. L. § 6-124. The political parties are delegated, expressly or impliedly, authority to determine the number of delegates and alternate delegates, and the percentage of delegate votes required to obtain a party's nomination at the convention.

26.    Section 6-158 of the Election Law provides that:

> A judicial district convention shall be held not earlier than the Tuesday following the third Monday in September preceding the general election and not later than the fourth Monday in September preceding such election.

N.Y. Elec. L. § 6-158(6).

10

## FACTS

27.      The following table of contents is provided for the factual

allegations of this complaint:

I.      The Judicial Convention Selection System                                (¶¶ 28-78)
        A.      The Sham Election for Judicial Convention Delegates            (¶¶ 29-56)
                1.  Party Leaders' Control Over Delegate Selection:
                    Structural Barriers to Electing Challenger Delegates       (¶¶ 29-53)
                        a.  Delegates Selected by Assembly District
                            While Supreme Court Candidates Selected
                            at Large by Judicial District                      (¶¶ 31-34)
                        b.  The Uniquely Large Number of Delegates
                            and Alternate Delegates                            (¶¶ 35-37)
                        c.  Party Leaders Control Replacement of
                            Absent Delegates and Alternate Delegates
                            at Judicial Conventions                            (¶ 38)
                        d.  Cumulative Petitioning Requirements
                            for Delegates                                      (¶¶ 39-49)
                        e.  Delegates' Allegiances Cannot Appear on the Ballot
                            to Educate Voters and Facilitate Challenges        (¶50)
                        f.  Disincentives to Running for Delegate
                            Without the Support of County Party Leaders        (¶¶ 51-52)
                        g.  The Real Qualifications for Delegates              (¶ 53)
                2.  Delegate "Elections" Without Candidates                     (¶¶ 54-56)
        B.      The Sham Nomination Process at Judicial Conventions            (¶¶ 57-71)
                1.  Party Leaders' Selection of Supreme Court Candidates Before the
                    Convention                                                 (¶ 58)
                2.  Convention Practices To Ensure Nomination of Party Leaders'
                    Candidates                                                 (¶¶ 59-68)
                        a.      Short Notice and High Absenteeism              (¶¶ 59-60)
                        b.      Scripted Format and Limited Duration           (¶¶ 61-68)
                3.  The 100% Success Rate of Candidates Supported by
                    Party Leaders                                              (¶¶ 69-71)
        C.      The Sham General Election                                      (¶¶ 72-78)
II.     The Uniqueness of New York State's Burdensome Supreme Court Selection
        System                                                                (¶¶ 79-90)
        A.      The Absence of Alternate Routes to Major Party
                Ballot Lines                                                  (¶¶ 79-87)
        B.      The Abbreviated Timetable To Prevent Insurgent
                Candidacies                                                   (¶¶ 88-89)
        C.      Judicial Elections in Other States                            (¶ 90)
III.    The Burdens on Candidates, Voters, and Party Members                   (¶¶ 91-100)
IV.     No Legitimate State Interest Justifies the Burdens Imposed
        by New York's Supreme Court Selection System                          (¶¶ 101-103)

I.      The Judicial Convention Selection System

28.      Virtually every aspect of the Supreme Court selection system prevents rank-and-file party members and voters from choosing who will be a justice.

A.      The Sham Election of Judicial Convention Delegates

1.      **Party Leaders' Control Over Delegate Selection:  Structural Barriers to Electing Challenger Delegates**

29.      New York is unique among states in requiring use of a judicial convention, rather than a party primary or nonpartisan general election, to select trial judges.  Moreover, the only path onto the general election ballot for major party candidates is to obtain their party's nomination at the judicial convention.

30.      Ostensibly, the voters elect judicial delegates in an election in September (the same Election Day on which primary elections are held for other offices). But the delegate selection process is designed to ensure that county party leaders rather than voters choose the judicial delegates and alternate delegates.  As a result, at the subsequent judicial conventions, those hand-picked delegates nominate by majority vote the party leadership's Supreme Court candidates for the general election.  The current system imposes an insurmountable burden on Supreme Court candidates who do not have the support of county party leaders ("challenger candidates" as they are termed here) but who wish to maintain candidacies for their party's nomination to the Supreme Court.

a.  **Delegates Selected by Assembly District While Supreme Court Candidates Selected at Large by Judicial District**

31.      New York State is divided into 12 judicial districts.  *See* N.Y. Jud. L. §140.  Each judicial district includes numerous Assembly Districts ("AD"), in whole or in part.  Judicial districts may include more than one county, but a county may not be

12

divided between two or more judicial districts. The Second Judicial District, for example, covers all of Brooklyn and Staten Island and includes 21 ADs in Brooklyn and three in Staten Island.[1]

32. While Supreme Court justices are selected at large by delegates from within the judicial district, those judicial delegates (and alternates) are selected separately from each AD within that judicial district. *See* N.Y. Elec. L. § 6-124. In heavily populated areas, each judicial district contains many ADs. Typically, each AD includes its own political clubs whose political organizing and other activities are discreet from those in other ADs.

33. Without the prospect of securing victory by a majority of delegates (and alternates) in support of a candidate, there is little purpose in running individual delegates who will support a judicial candidate not backed by the party leadership. To obtain such a majority, that challenger candidate would have to organize, petition, and run slates of delegate and alternate delegate candidates in every AD and elect a majority of these candidates across the entire district. In the Second Judicial District, for example, such a challenge would require recruiting and running at least 305 delegates and alternates across two counties and 24 ADs and prevailing in, at a minimum, at least 80 of the delegate races and an equal number of alternate delegate races.

---

[1] The 12 districts, with the counties that are included in each district listed in parentheses, are as follows: 1st Judicial District (New York); 2nd Judicial District (Kings, Richmond); 3rd Judicial District (Albany, Columbia, Greene, Rennselaer, Schoharie, Sullivan, Ulster); 4th Judicial District (Clinton, Essex, Franklin, Fulton, Hamilton, Montgomery, St. Lawrence, Saratoga, Schnectady, Warren, Washington); 5th Judicial District (Herkimer, Jefferson, Lewis, Oneida, Onondaga (including Syracuse), Oswego); 6th Judicial District (Broome, Chenung, Chanango, Cortland, Delaware, Madison, Otsego, Schulyer, Tioga, Tompkins); 7th Judicial District (Cayuga, Livingston, Monroe (including Rochester), Ontario, Seneca, Steuben, Wayne, Yates); 8th Judicial District (Allegany, Cattaraugus, Chautauqua, Erie (including Buffalo), Genesee, Niagara, Orleans, Wyoming); 9th Judicial District (Dutchess, Orange, Putnam, Rockland, Westchester); 10th Judicial District (Nassau, Suffolk); 11th Judicial District (Queens); and 12th Judicial District (Bronx).

34.     Only the party leadership *for an entire county* possesses the resources and political organization needed to overcome the atomized nature of judicial delegate selection by AD and to elect a majority of delegates. This system effectively ensures the dominant control of county party leadership over the selection process, by stacking the deck against unified, countywide challenges. This barrier, in turn, further discourages any individual who would consider running to become a Supreme Court justice or judicial delegate from doing so.

### b.  The Uniquely Large Number of Delegates and Alternate Delegates

35.     The Election Law grants to the political parties substantial control over the number of delegates and alternate delegates at the judicial convention. The Democratic Party currently allots each AD one delegate and one alternate delegate, plus an additional delegate and alternate for each 2,500 votes cast for the party's gubernatorial candidate at the most recent general election. The Republican Party follows the same formula for eight of the twelve judicial districts, but uses 4,000 votes (rather than 2,500) as the multiplier in the Third and Fourth Judicial Districts, and 5,000 in the Seventh and Eighth Judicial Districts.

36.     These formulas require such a large number of delegate positions to be filled that any attempt to run delegates and alternates across a judicial district and to elect a majority to challenge the county party leadership's delegates at the convention is effectively doomed to failure. In the Second Judicial District in 2002, as noted, 305 judicial delegates and alternates were selected for the Democratic Party's judicial convention. In the Fifth Judicial District in Upstate New York, 184 judicial delegates and alternates were selected for the Republican Party's judicial convention.

14

37.   The laws governing other New York races that include conventions do not require the involvement of nearly as many delegates.  While the presidential primaries have roughly 5-6 delegates per congressional district, the current Supreme Court selection system has an average of over six delegates per AD in the Second Judicial District and more in specific ADs despite the fact that congressional districts are typically more than three times larger than ADs.  Similarly, more delegates are elected from each AD to nominate Supreme Court candidates than are elected to select candidates for Governor or U.S. Senator.  No legitimate reason exists for these discrepancies.

### c.   Party Leaders Control Replacement of Absent Delegates and Alternate Delegates at Judicial Conventions

38.   If neither a delegate nor an alternate from an AD is present to fill a delegate seat at the judicial convention, state law allows the delegates from that AD, often overseen by county party leaders, to appoint replacements.  N.Y. Elec. L. § 6-124. Such replacements are appointed without submitting their names (much less signed petitions) to the county board of elections.  This statutory tool bolsters county party leaders' control over the selection of delegates who will cast a vote at the convention.

### d.   Cumulative Petitioning Requirements for Delegates

39.   The current system imposes insurmountable petitioning requirements on challenger delegate candidates (and, as a result, upon challenger Supreme Court candidates) just to obtain access to the ballot for the September delegate elections.

40.   For an individual to petition onto the ballot as a candidate for delegate, 500 signatures must be gathered from members of the individual's political

15

party who live within the AD. N.Y. Elec. L. § 6-136(2)(i), (3). As courts in this circuit have found, however, challengers typically must obtain many more signatures than are required by law – at least two to three times the statutory minimum – in order to withstand a virtually inevitable legal challenge to such petitions from the party leadership.

41.     The statutory selection of judicial delegates by AD thus effectively requires that the challenger Supreme Court candidate satisfy all of the petitioning requirements for each of these delegate candidates, or slates of such candidates, in each AD across the judicial district. In the Second Judicial District, for example, a Democratic Party challenger candidate for Supreme Court must place a total of 305 judicial delegate and alternate delegate candidates distributed across 24 ADs in two counties (Brooklyn and Staten Island) just to secure the *possibility* of electing a majority of delegates and alternates to the convention. Even assuming that challenger delegate candidates are able to gather petitions as a slate in each AD, that means gathering at least 12,000 signatures (the statutory minimum required) from registered party members in 37 days (the statutory time limit) and at least 24,000 to 36,000 signatures to withstand legal challenges. In the Fifth Judicial District Upstate, for Republican Party candidates that means gathering at least 6,000 signatures (or 12,000-18,000 to withstand legal challenges), distributed evenly across 12 ADs in six large counties, in order to place at least 93 delegate candidates and an equal number of alternate delegates on the ballot.

42.     A prohibition against any party member signing more than one petition for a slate of delegates makes it even more difficult to perform this geographical and organizational challenge, for the pool of eligible signatories shrinks with each

16

signature gathered.

43.     By contrast, to obtain a ballot line as a major party candidate for mayor in New York City, a candidate must gather a statutory minimum of only 7,500 signatures. N.Y. Elec. L. § 6-136. Moreover, a mayoral candidate need not gather those signatures from any particular geographic areas within New York City. Similarly, to obtain a ballot line as a major party candidate for *countywide* Civil Court judgeships in New York City, a candidate must gather a statutory minimum of only 4,000 signatures, again without geographic distributional requirements. *Id.*

44.     The costs of mounting such a challenge to place delegate and alternate candidates on the ballot would include, among other things:

- Identifying, contacting, and recruiting suitable and supportive delegate candidates in each of the many ADs within the judicial district who agree to run, campaign, and defy their local party leaders by voting for a challenger Supreme Court candidate at the convention;

- Running a complete petitioning operation in every AD;

- Running a fundraising operation;

- Printing petitions for each of the delegate candidate slates in each AD; and

- Defending petitions against legal challenges (discussed below).

45.     While the county party leadership obviates the need for their delegate candidates of choice to pay these costs, a challenger delegate candidate must herself pay or find sources to pay these costs. The county party leaders and local political clubs under their control also provide volunteers to gather signatures without cost in many instances. Further, the county party leadership gathers signatures for a slate of delegate candidates on a single petition in each AD, rather than for individual candidates on separate petitions. The party-backed delegate candidates are simply included on the

17

petitions of the party's candidates for higher offices within the AD. An individual challenger candidate does not have the benefit of this economy of scale.

46.     The challenger delegate candidate must also expend substantial funds to hire an election lawyer to review his or her petitions for accuracy before submission to the county board of elections and to defend those petitions against challenges in court. The challenge process is extremely costly, particularly where multiple jurisdictions are involved.  Additional legal fees must be incurred if one hopes to challenge those petitions filed by party-backed delegate candidates.  While the party-backed candidates can call upon the party to provide such legal representation in many cases, the challenger must pay these costs out of her own campaign funds.

47.     Nor would such expenditures on petitioning in any way ensure that the delegate candidates actually prevail over the county party leaders' delegate selections. The costs outlined above do not include *any* of the necessary costs of the subsequent delegate election campaigns in each AD – at least 24 and possibly over 300 separate campaigns in the Second Judicial District alone – that would likely exceed significantly the costs of petitioning.

48.     Indeed, even if a challenger Supreme Court candidate were able to meet this astronomical price tag and the unimaginable operational challenges involved, he or she still would not have replicated the experienced, countywide campaign and get-out-the-vote operations controlled by the county party leaders across the state.  Such barriers can be even greater in rural counties where gathering signatures, communicating with voters, and getting them to vote on Election Day require overcoming significant distances and barriers to mass communication.

18

49.    For Supreme Court candidates attempting to run without the county party leaders' support, these barriers to having the *opportunity* to elect sufficient delegates to have the *possibility* of obtaining the party's nomination at the judicial convention are prohibitive.

### e.    Delegates' Allegiances Cannot Appear on the Ballot to Educate Voters and Facilitate Challenges

50.    Unlike presidential delegates, moreover, New York's judicial delegates cannot appear on the ballot with any indication of their allegiance to a specific Supreme Court candidate. As a result, even if a Supreme Court challenger candidate successfully petitions to place a supportive delegate candidate on the ballot, he or she must inform the voters through costly campaign literature or advertising of that delegate's allegiance. Further, the challenger must repeat that costly and unprecedented public education campaign in each AD for scores of different delegate candidates.

### f.    Disincentives to Running for Delegate Without the Support of County Party Leaders

51.    These barriers are compounded by the significant disincentives to running for delegate that render it impossible for challenger Supreme Court candidates to recruit and elect delegate candidates.

52.    Above and beyond the slim chance of being elected a delegate as a challenger are the unattractive qualities of the position itself. A judicial delegate must serve as one of a large number of delegates at a single low-profile convention, in a single year, and without any compensation. Moreover, unlike presidential delegates, judicial delegates do not have the satisfaction of being elected to support a specific candidate.

### g.    The Real Qualifications for Most Convention Delegates

19

53. Upon information and belief, county party leaders choose judicial delegates and alternate delegates principally for their unwavering loyalty and their willingness to support without qualification the judicial candidates chosen by those leaders. Judicial delegates and alternates often have little connection to the ADs they purport to represent; they frequently do not even reside within the AD and "represent" one AD in one year and another in the following year, depending on the wishes of county party leaders. Upon information and belief, the county party leaders routinely select themselves or their own employees as judicial delegates.

### 2. Delegate "Elections" Without Candidates

54. As a result of these severe burdens on Supreme Court candidates' efforts to run challenger delegates, only a tiny handful of the judicial delegates and alternates who are selected even appear on the ballot because they are not opposed by other candidates.

55. In New York City, for example, from 1999 through 2002 only 14% of the 4,825 judicial delegate candidates selected by the two major parties actually appeared on any ballot. The Republican Party placed only one percent (1%) of their delegates on the ballot in New York City during this period. The Democratic Party selected 80% of its judicial delegates without placing them on the ballot.

56. Outside New York City, delegates are even less likely to be placed on the ballot. Upon information and belief the counties of Albany, Erie, Nassau, Suffolk and Tompkins have all selected judicial delegates without placing a single candidate, Republican or Democratic, on a ballot at least since 1999.

### B. The Sham Nomination Process at Judicial Conventions

20

57. The judicial conventions reflect the absence of input from rank-and-file party members or voters in the selection of Supreme Court justices and ensure that challenger candidates cannot earn a place on the ballot.

**1.    Party Leaders' Selection of Supreme Court Candidates Before the Convention**

58. In each county, the party leadership has developed a procedure for selecting the Supreme Court candidates to be approved at the judicial convention. While these procedures vary in their details, they uniformly deprive voters and rank-and-file party members of meaningful input in the selection process.

**2.    Convention Structures to Ensure Nomination of Party Leaders' Candidates**

**a.    Short Notice and High Absenteeism**

59. The state party chairpersons for each of the two major parties initiate the convention proceedings by designating a "convenor" in writing, usually approximately one to two weeks prior to the convention.

60. High absentee rates for judicial delegates at conventions reflect both the short notice and the extent to which delegates serve as no more than a rubber stamp on the county party leadership's selection of Supreme Court candidates. In the Bronx, for example, the minutes for Democratic Party judicial conventions held between 1999 and 2002 show an average absentee rate for delegates of 24%. Outside of New York City, the minutes of the conventions for which attendance information is available from 1994 through 2002 show an average absentee rate of 33%. The absence of delegates and alternates allows county party leaders to oversee the appointment of replacements at the convention itself, and thereby further ensures their control over the

21

convention vote.

**b.    Scripted Format and Limited Duration**

61.    Because of the county party leaders' control over delegate selection, the nomination process at the conventions is, with extremely rare exceptions, virtually all formalized procedure, with no substantive decision-making by the delegates. The participants follow a consistent, almost scripted format from which they rarely deviate. As a result, the conventions are usually concluded in record time.

62.    At the appointed hour, the convenor calls the convention to order and ascertains whether a quorum of delegates is present. If a quorum is not present, alternates and even others may be appointed to replace absentees. Upon information and belief, many of these replacements thus have neither been elected by the voters nor gathered the requisite petitions to be considered for the position.

63.    Next, the convention delegates must elect a temporary chairperson and then a temporary secretary, whose only function is to oversee the subsequent election of a permanent chairperson and secretary. In most cases, the chairperson who presides over the convention is selected in advance by the county party leadership and often performs this function year after year. There have been no successful challenges to the anointed chairperson at any of the judicial conventions since at least as early as 1994 and, upon information and belief, even earlier.

64.    After several insubstantial formalities, the chairperson then calls for nominations for Supreme Court Justices. As a technical matter, all nominations are "from the floor," but there is virtually never a nomination that is not known and supported by the county party leaders before the convention begins.

65. The chairperson calls upon a delegate selected in advance to nominate a specific nominee. Then a pre-selected delegate seconds the nomination.

66. At most conventions, the chairperson then invites a motion to close nominations for that position, the motion passes by unanimous voice vote, and the candidate is announced as the party's nominee. The convention then repeats this process for each remaining open position. In a minority of conventions, the chairperson oversees the nomination for a slate of candidates and the delegates' vote is postponed until the entire slate has been announced.

67. A judicial candidate must receive at least a majority of the delegates' votes to obtain the party's nomination. This stands in stark contrast with the party conventions used for statewide offices in New York to select candidates for the primary election; such conventions allow nomination by only 25% of the delegates at the convention.

68. The brevity of the conventions reflects the absence of real debate or deliberations. In the Second Judicial District, for example, the average length of the Democratic Party judicial conventions from 1994 through 2002 for which data are available was 25.3 minutes. The longest Democratic Party convention in Brooklyn during this period ran 45 minutes, while the shortest took only 11 minutes during which eight Supreme Court candidates were nominated and approved. Across the rest of New York State, the average duration of judicial conventions is less than one hour.

### 3. The 100% Success Rate of Candidates Supported by Party Leadership

69. None of the Supreme Court candidates who were selected at Democratic or Republican conventions across the State from 1994 through 2002 about

23

whom data are available (i.e., 502 of 508) were successful challengers without the party leaders' support.[2] For the remaining six candidates, conclusive evidence is not available at this point, but Plaintiffs have no reason to believe that they *any* of them were successful challenger candidates.

70.    In New York City, from 1994 through 2002, 137 Democratic candidates were selected without a single successful challenge at any of the 32 conventions. The Republican Party selected 131 Supreme Court candidates over that period without a single recorded challenge, successful or otherwise.

71.    Outside New York City, from 1990 through 2002, none of the candidates selected by the two major parties' conventions about whom data are available (i.e., 448 of 456) were challengers without the party leaders' support. For the remaining eight candidates, conclusive evidence is not available at this point, but Plaintiffs have no reason to believe that they *any* of them were successful challenger candidates.

**C.    The Sham General Election**

72.    The voters' lack of influence over the choice of candidates at the parties' nomination stage is exacerbated by the fact that, in all but a few cases, it is the convention nomination process rather than the general election that determines who shall become a Supreme Court justice. Most voters in New York State face general elections for Supreme Court that are, more often than not, literally uncontested.

73.    Uncontested elections occur either because only one party decides it is worthwhile to run a candidate, or because of cross-endorsement, whereby one party endorses the other party's candidate rather than place its own candidate on the ballot.

---

[2] Two candidates were selected as a result of a split between two factions within the Democratic Party's leadership in Erie County in 2000. Neither of those candidates ran as a challenger candidate without the backing of party leaders.

24

(No candidate who did not have the endorsement of either the Democratic or Republican Party has won a Supreme Court election in New York State, since at least 1990. In fact, 96% of minor party candidates without such an endorsement received less than 20% of the winners' total vote tallies. For this reason, if a Supreme Court election does not include both Democratic and Republican candidates for the position in question, it is not contested in any meaningful sense.)

74. From 1990 through 2002, 47% of the general elections in New York State for Supreme Court were uncontested with respect to major party candidates (*i.e.*, only one Democratic or Republican candidate appeared on the ballot for each open seat). Moreover, more than 62% of New York State voters live in judicial districts where the two major parties contest less than half the Supreme Court elections.

75. In the Second Judicial District, over half (51%) of the victorious Democratic candidates during this period were cross-endorsed by the Republican Party at its own convention and did not face even token opposition. In the Twelfth Judicial District (the Bronx), 95% of the winning candidates were cross-endorsed by the Republican Party during the same period. In each of the other two judicial districts within New York City, more than half of the Supreme Court elections during this period were uncontested by the two major parties (Manhattan (85%) and Queens (59%)). In the Third through Eighth Judicial Districts, covering 50 out of 57 counties outside New York City and the cities of Albany, Schnectady, Syracuse, Rochester, and Buffalo, fully 50% of elections since 1990 were uncontested by the two major parties.

76. Even when both major parties place candidates on the general election ballot, moreover, in the overwhelming majority of elections the outcome cannot

25

be considered competitive. Political scientists commonly conclude that an election cannot be considered "competitive" if the losing candidate garners less than 80% of the winning candidate's vote total (equivalent to a 55%-45% margin).

77.     In New York City, from 1990 through 2002, only five out of 221 Supreme Court elections (*i.e.*, 2%) could be considered "competitive" by this measure. In the eight judicial districts that cover the rest of the state, 56% of the Supreme Court elections have been either literally uncontested or non-competitive during that period. Only two districts in New York State – the Ninth and the Tenth – held Supreme Court elections that could be considered competitive more than half the time during that period.

78.     In all, since 1990 New York State's voters have faced Supreme Court elections that were either uncontested or non-competitive 76% of the time (350 out of 460 elections).

## II.     The Uniqueness of New York State's Burdensome Supreme Court Selection System

### A.     The Absence of Alternate Routes to Major Party Ballot Lines

79.     The county party leaders' complete control over the outcome of the judicial conventions would not necessarily deprive the voters of their right to choose their Supreme Court justices if a primary election or alternative paths onto the general election ballot existed for major party candidates. Unlike candidates for *all* other New York State elective offices, however, under state law Supreme Court candidates cannot appear on the general election ballot as a candidate of one of the two major parties without being chosen by the party leadership and approved at the judicial convention.

80.     For all elective offices except Supreme Court justice, New York State uses one of two methods to determine which individuals from a political party

26

obtain a place on the general election ballot.

81.     First, in statewide elections for U.S. Senator, governor, lieutenant governor, attorney general, and state comptroller, the recognized parties select their candidates for a primary election at a party convention in June. Whichever candidates obtain at least 25% of the convention delegates' votes are automatically placed on the primary ballot. The 25% threshold ensures that even if one candidate has the support of a majority of party leaders, voters will likely have the choice of several candidates from their party on the primary ballot.

82.     But even a statewide candidate who fails to obtain at least 25% of the delegates' votes may still earn a place on the primary ballot as a candidate of their party through a direct petitioning process.

83.     Second, New York State's Assembly and Senate candidates obtain a place on the primary ballot by gathering signatures directly from voters rather than through a convention system. *See* N.Y. Elec. L. §§ 6-1362(h), (i).

84.     Similarly, the judges of the Civil Court of the City of New York are chosen through a direct primary election between candidates who petition onto the ballot. Candidates within the Democratic or Republican Parties can petition onto the primary election ballot for countywide Civil Court judgeships by obtaining 4,000 signatures and filing such petitions with the Board of Elections. *See* N.Y. Elec. L. §§ 6-136, 6-168. Not surprisingly, multiple candidates from the same party compete in the primary election, and well-qualified candidates who would not be able to obtain the county party leadership's backing for Supreme Court have the opportunity to become Civil Court judges.

27

85. In all of these offices, the voter's choice among candidates at the primary election then becomes the party's nominee in the general election.

86. By contrast, New York State's Supreme Court convention system includes no primary election for judicial candidates, no threshold lower than 50% of judicial delegates to obtain a convention nomination, and no way to petition onto the ballot as a party candidate.

87. In sum, potential candidates for *all other elective state offices* have several paths onto the ballot, each much less onerous than that required of Supreme Court candidates.

**B.      The Abbreviated Timetable To Prevent Insurgent Candidacies**

88. The unique timetable for Supreme Court selection in New York State exacerbates an already insurmountable burden on potential candidates. Judicial delegates are selected in the first week of September, the judicial convention occurs in the third week of September, and the general election is in early November. *See* N.Y. Elec. L. § 6-158(5). Judicial candidates cannot know whether voters will even see their name on the ballot until roughly five to six weeks prior to the election. Moreover, Supreme Court candidates learn who has been selected as a judicial delegate no more than two weeks before the convention. Even if open-minded delegates were selected at the September election, therefore, judicial candidates without the party leadership's backing would not and do not have sufficient time to identify, contact, and convince the chosen delegates to vote for them at the convention rather than for the party-backed candidates.

89. By contrast, the party conventions to nominate candidates for

28

statewide offices are held in June in election years, a primary election for the candidates for those offices (rather than for delegates to the convention) is held in September, and the general election is held in November. Similarly, the New York State Assembly and Senate elections allow petitioning onto the ballot nine weeks or more prior to the September primary election.

### C.    Judicial Elections in Other States

90.    The current judicial convention system in New York State imposes a burden on voters and candidates that no other state has imposed. Out of the 33 states that elect at least some of the judges on their trial court of general jurisdiction, New York alone requires nomination of candidates through a convention system. Every other state that elects its trial judges in partisan elections allows candidates to petition onto a primary election ballot. Those states with nonpartisan judicial elections allow candidates to obtain a place on the ballot through petitioning or other reasonable notice to allow voters to have a meaningful choice on Election Day.

## III.    The Burdens on Candidates, Voters, and Party Members

91.    The current Supreme Court selection system imposes severe burdens on prospective Supreme Court candidates, voters, and rank-and-file members of the major parties in the exercise of their federal associational and voting rights.

92.    New York's byzantine selection system severely and unnecessarily burdens Supreme Court candidates who are well qualified for Supreme Court service but not backed by the county leadership of the Democratic or Republican Parties.

93.    The experience of Plaintiff Margarita López Torres illustrates the burden on major party candidates who are impermissibly prevented by the current system

29

from running as a member of their own party. Judge López Torres won her Civil Court seat in 1992 with the support of the Democratic Party county leaders in Brooklyn. But when she sought the Democratic Party's nomination for Supreme Court in 1997, and again in 1998, 2002, and 2003, for reasons unrelated to her judicial qualifications the Democratic Party County Chairman and the other county party leaders refused to support her nomination. In fact, those leaders even drafted a candidate to challenge her for her Civil Court seat in 2002, which she retained through widespread support among voters. In 2002, the chair of the County Chairman's judicial screening panel informed Judge López Torres that she would not even be considered because the County Chairman had not referred her name for consideration.

94.    Nor could Judge López Torres run delegates to support her bids for her party's nomination because the burdens imposed by New York's statutory selection system are, as described above, too severe. Despite widespread voter support -- she obtained more votes (200,710) for Civil Court in 2002 than *any* of the Democratic Party's candidates *for Supreme Court* did in Brooklyn on the same day – the current system thus has prevented her from having *any* meaningful opportunity to be chosen by her party to be a Democratic candidate for Supreme Court.

95.    Nor is the possibility of running as a minor party candidate a meaningful solution for candidates who are not endorsed by Democratic or Republican Party leaders (even if it were constitutional to force a candidate to give up her party affiliation to obtain a place on the ballot). Upon information and belief, no candidate running solely with the endorsement of a minor party has ever prevailed in a Supreme Court election.

30

96.     Again, Judge López Torres' example demonstrates this reality. In 2003, after she could not overcome the party leaders' opposition once again, she chose to run as a Supreme Court candidate for the Working Families Party, which ran a slate of Supreme Court candidates for the first time that year. Predictably, despite obtaining a place on the ballot and the endorsements of the *New York Times,* the *Daily News,* the *New York Sun,* and *El Diario*, Judge López Torres and all of the other Working Families Party candidates lost by a massive margin to the Democratic Party's candidates.

97.     Because of these severe burdens on challenger candidacies, New York's restrictive selection system severely burdens voters' right to vote by depriving them of any meaningful choice of candidates, and thus of their rightful choice of who becomes a Supreme Court justice.

98.     In a 2003 survey of voters, the Marist College Institute for Public Opinion found that 66% of New York State's voters either believe that Supreme Court justices in New York are appointed or are unsure whether they are elected or appointed.

99.     By contrast, New York's voters are considerably more aware of their right to vote for county and civil court judges -- offices where nominees are chosen through direct primary elections rather than judicial conventions – despite the fact that these courts have a more limited jurisdiction. According to the survey, 60% of New York's voters correctly believe that county and civil court judges are elected, while only 19% erroneously believe that such judges are appointed. In other words, voters' awareness of their right to elect corresponds directly to whether they are, in practice, allowed to vote effectively in the selection system provided by New York State's Election Law.

31

the current Supreme Court selection system also deprives rank-and-file members of the Democratic and Republican Parties of their right to associate and to choose their party's candidates for the general election. County party leaders retain exclusive control over the party's choice of delegates and Supreme Court candidates in each judicial district. Regardless of party members' support for a Supreme Court candidate, the current system prevents members from having any adequate means to express that support to produce a nominee.

## IV.  No Legitimate State Interest Justifies the Burdens Imposed by New York's Supreme Court Selection System

101.    No compelling or even legitimate state interest justifies the severe burdens imposed on challenger Supreme Court candidates, party members, and voters. The only remotely relevant state interests – to ensure that candidates have demonstrated a modicum of support among voters and to avoid potential confusion from an excess of candidates on the ballot – are not only *not* served by the current system but are served well, and with significantly fewer burdens on candidates and voters, by the ballot access rules used to fill every other New York State office and trial courts in 33 other states.

102.    Moreover, the current system directly contravenes the only directly relevant and compelling state interest, namely the New York State Constitution's command that Supreme Court justices "shall be chosen by the electors [*i.e.*, the voters]."

103.    Like the scores of states that use a direct primary election system to choose their principal trial judges, New York State could adopt, without difficulty or threat to any legitimate interests, a system that does not impose severe burdens upon the rights of voters, party members, or candidates.

32

**(COUNT ONE)**
**First and Fourteenth Amendments –**
**Burden on Rights to Vote and Associate**

104.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-102 as if set forth herein at length.

105.    The current judicial convention system of selecting Supreme Court justices, established by N.Y. Elec. L. §§ 6-106, 6-124, 6-158, imposes a severe burden on the candidates' and voters' fundamental right to vote. Specifically, by erecting severe and unjustified barriers to candidacies, the current system has deprived and will continue to deprive candidates of their right to obtain a place on the ballot as a member of their own party, voters of their right to vote effectively by choosing a candidate of their choice, and rank-and-file party members of their associational right to select their party's candidates. Plaintiffs have suffered, and will continue to suffer, severe and unjustified burdens upon these rights as voters and present and future Supreme Court candidates.

106.    By reason of the foregoing, Defendants, acting under color of state law, have deprived and will deprive Plaintiffs of the rights, privileges, and immunities secured to them by the First and Fourteenth Amendments to the United States Constitution and protected under 42 U.S.C. § 1983.

107.    Defendants have no compelling or important interest that justifies this severe burden upon Plaintiffs' fundamental rights to vote and to associate.

108.    Plaintiffs have no adequate remedy at law for such deprivation of their rights, privileges, and immunities.

**(COUNT TWO)**
**Fourteenth Amendment –**

33

Violation of Equal Protection Clause

109.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1-107 as if set forth herein at length.

110.    The current judicial convention system of selecting Supreme Court justices, established by N.Y. Elec. L. §§ 6-106, 6-124, 6-158, imposes an unequal and unjustified burden on candidates' and voters' fundamental right to vote. Specifically, the current system denies candidates and voters across the state equal protection of the laws by imposing, without legitimate justification, a virtually insurmountable burden upon any challenger candidates for Supreme Court, while imposing a much lesser burden on, for example, candidates for civil court judgeships, New York City mayor, and even statewide offices such as governor, senator, attorney general, and comptroller.

111.    In addition, the Supreme Court selection system arbitrarily burdens challenger candidates and their supporters far more than party-backed candidates. Because the barriers to obtaining access to the ballot are so significant for such challengers, the practical effect of the current system is to devalue the votes of their supporters relative to those cast by their fellow voters. In fact, the supporters of such challengers are never even allowed to vote for their candidates of choice.

112.    By reason of the foregoing, Defendants, acting under color of state law, have deprived and will deprive Plaintiffs of the rights, privileges, and immunities secured to them by the Fourteenth Amendment to the United States Constitution and protected under 42 U.S.C. § 1983.

113.    Defendants have no compelling or important interest that justifies this unequal treatment of Plaintiffs and these unequal burdens upon their rights to vote

34

and to associate.

114. Plaintiffs have no adequate remedy at law for such deprivation of their rights, privileges, and immunities.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully ask this Court:

(1) To enter judgment declaring and determining that the current judicial convention system of selecting Supreme Court justices, established and facilitated by N.Y. Elec. L. §§ 6-106, 6-124, 6-158, violates the United States Constitution, specifically the First and Fourteenth Amendments, both facially and as applied to Plaintiffs;

(2) To grant the appropriate equitable relief, including an injunction allowing the New York State Legislature to establish, within 90 days of this Court's judgment, a new system of Supreme Court justice selection that is consistent with the federal Constitution and this Court's findings, provides a real opportunity for candidates with public support to compete for their party's nomination, and consequently gives voters their constitutional right to vote effectively to choose their Supreme Court justices;

(3) If the New York State Legislature fails to establish a new system of selection as outlined above, to order as interim relief at least until such time as the Legislature acts to do so, that Supreme Court justices be selected through a system that includes (a) a direct primary election for Supreme Court, and (b) an avenue by which candidates may obtain a place on the primary election ballot of their party by gathering a reasonable number of signatures by petition.

(4)     To award Plaintiffs their costs and disbursements associated with the filing and maintenance of this action, including an award of reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

(5)     To award such other equitable and further relief as the Court deems just and proper.

Dated: March 18, 2004

Frederick A.O. Schwarz, Jr. (FS2047)
Burt Neuborne
Deborah Goldberg (DG9285)
Jeremy Creelan (JC7222)
BRENNAN CENTER FOR JUSTICE
   at New York University School of Law
161 Avenue of the Americas, 12th Floor
New York, NY 10013
Ph: (212) 998-6730

Attorneys for Plaintiffs

36